*Formatted for Electronic Distribution*                                                         *For Publication*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

_____

**In re:**
    **Kevin B. Carpenter,**
              **Debtor.**

_____

Filed & Entered
On Docket
June 26, 2008

**Chapter 7 Case**
**# 07-10378**

| Appearances: | John Canney, Esq. | Kim F. Lefebvre, Esq. |
|---|---|---|
|  | Rutland, VT | Albany, NY |
|  | for the Trustee, Pro Se | Assistant U.S. Trustee |

**MEMORANDUM OF DECISION**
**DENYING TRUSTEE'S MOTION TO AMEND APPLICATION TO EMPLOY AUCTIONEER *NUNC PRO TUNC***
**AND DIRECTING TRUSTEE TO SHOW CAUSE**
**WHY BUYER'S PREMIUM SHOULD NOT BE DEDUCTED FROM TRUSTEE'S COMMISSION**

    The chapter 7 case trustee (the "Trustee") moved to modify, <u>nunc pro tunc</u>, the Application to Employ Auctioneer that he had filed eight months earlier. The Trustee stated that his original application "neglected, through inadvertence, to disclose to the Court that a 10% 'buyer's premium'[1] would be collected at the auctions and be retained by the Auctioneer" (doc. # 78). The United States Trustee ("UST") has appeared in support of the Trustee's motion. For the reasons that follow, the Court denies the Trustee's motion to amend the application <u>nunc pro tunc</u>, and directs the Trustee to appear and show cause why the buyer's premium should not be paid from funds which would otherwise be allocated to the Trustee's commission.

**Facts and Procedural History**

    In July 2007, John Canney, Esq., as the chapter 7 case trustee, filed an application to employ Robert Prozzo as auctioneer in this case (the "Auctioneer") to liquidate some of the assets of the Debtor's estate, which included inventory, equipment, furniture, and fixtures of Middlebury Jewelry in Middlebury, Vermont (doc. # 17). The terms of employment were detailed in the application as follows:

<u>Commission</u>

(a) Nine percent (9%) of any gross proceeds of sale under $100,000.00. Eight percent (8%) of any proceeds thereafter. It is anticipated that the sale will be for less than $125,000.

<u>Reasonable and Necessary Expenses</u>

Reasonable and necessary expenses, including, but not limited to, set-up, and adver-

---

[1] "A 'buyer's premium' is an additional charge assessed against a successful bidder at an auction. 'Simply stated, [a buyer's premium] is adding [a] sales commission as an obligation to the buyer after the bid." Leslie H. Miles Jr., "Buyer's Premium", 18-Oct. Am. Bankr. Inst. J., 26 (Oct. 1999)." <u>In re Driller</u>, 2004 WL 1661981 * 1 n.1 (Bankr. D. Idaho, July 7, 2004).

tising. All workmen's compensation, social security, unemployment insurance or other payroll taxes shall be excluded.

Payment of said commission and expenses will be subject to final Court approval.

Id. The application did not indicate that the compensation for liquidating assets would be anything other than routine. The Order approving the application to employ was entered in August 2007 (doc. # 42). Subsequently, the Trustee filed a notice of intent to sell personal property (doc. # 45), which recited the same terms of employment set out in the application, and the Court entered an Order approving the sale (doc. # 57).

In January 2008, the Auctioneer, through the Trustee, filed two Reports of Sale which described the auctions, held on October 21, 2007 and December 9, 2007, to liquidate the Debtor's assets (docs. ## 69, 70, respectively). The Report of Sale for the October 21, 2007 auction stated that the Auctioneer collected gross proceeds totaling $58,415.00 and, less necessary expenses, netted $52,515.00 (doc. # 69). The Report of Sale provided a breakdown of the expenses (including promotional efforts, organizing, cataloguing, set-up labor, and supplies). Id. It stated that the auctioneer's fee was 9% of the gross sales, or $5,257.35, and that the few remaining items that did not generate bids would be held until the December 9, 2007 auction when the balance of the Middlebury Jewelry Store inventory would be sold. Id.

The Report of Sale for the December 9, 2007 auction indicated that gross proceeds totaled $49,895.50 and, less necessary expenses, netted $45,634.31 (doc. # 70). Similar to the Report of Sale for the earlier auction, this Report included a breakdown of expenses and fees. With regard to the latter, the Report stated that the Auctioneer's fee was 9% of gross sales on the first $41,585 of sales, or $3,742.65, and 8% on the balance of sales, or $664.84. Id. The Trustee's Report of Auction and Application for Approval of Commission, Compensation, and Expenses, dated January 16, 2008, accompanied each Report of Sale. In those documents, the Trustee essentially repeated the figures set out in the Auctioneer's Reports, and stated that $5,257.35 in commissions and $93.80 in expenses remained to be paid from the October 2007 auction (doc. # 71) and $4,411.45 in commissions remained to be paid from the December 2007 auction (doc. # 72).

In March 2008, the Trustee filed a Motion to Amend Application to Employ Auctioneer Nunc Pro Tunc (doc. # 78) (the "Trustee's Motion"), an Amended Report of Auction and Application for Approval of Commission, Compensation, and Expenses of Auctioneer (doc. # 76), and an Amended Trustee's Report (doc. # 77). In the Trustee's Motion, the Trustee stated that the original application neglected to disclose to the Court that a 10% buyer's premium would be collected at the auctions and retained by the Auctioneer; that the buyer's premium "was agreed to by the Trustee, Secured Creditor and Auctioneer"; and that "due to the special nature of the merchandise, the expertise required in dealing with it and the additional work . . . taken on by the Auctioneer there was 'good cause' for the allowance" (doc. # 78). The Trustee observed that all advertising for the auctions had contained a notice that the buyer's premium

2

would be collected,[2] adding that this had been the Auctioneer's first bankruptcy auction and the lack of disclosure of the buyer's premium "was not intentional. It was an oversight by all parties as it is not the norm in a standard auction scenario." Id. The Trustee argued that special circumstances existed to warrant payment of the premium. He recounted how the Auctioneer, who had expertise in fine jewelry, had come to the jewelry store on an hour's notice to begin removing and cataloguing the inventory, fixtures, and equipment so that the items could be secured and safely moved, and so the estate would not incur further rental charges. He stated that the Auctioneer had expended a considerable amount of time in examining and sorting out the merchandise. According to the Trustee, the Auctioneer's efforts were instrumental in the "resounding success" of the auctions, where "$108,310 was collected, not including the 'buyers premium,' and where the Secured Creditor was fully paid." Id.  Accompanying the Trustee's Motion was an Auctioneer's Amended Report of Sale for each auction, disclosing a $5,841.50 buyer's premium earned at the October auction (doc. # 81) and a $4,158.50 buyer's premium earned at the December auction (doc. # 82).

Over two weeks later, on April 7, 2008, the Trustee filed a Second Amended Report of Auction, in which he provided different figures for the amounts received from the December 2007 auction, including a buyer's premium of $4,989.55 and a total amount due to the Auctioneer of $4,407.49 (doc. # 86). This Report was supported by the Auctioneer's Second Amended Report of Sale (doc. # 85). The Auctioneer is currently holding the buyer's premiums for both auctions, totaling $10,831.05.

Shortly thereafter, the UST filed two statements (one pertaining to each auction) (doc. ## 87, 88) asserting that the UST considered the buyer's premiums to be estate property that "must always be reported as part of the gross proceeds collected at an auction sale" (Id. ¶ 6), and raising no objection to the Auctioneer's retention of the buyer's premiums (Id. ¶ 7).

The Court held a hearing on the Trustee's Motion for nunc pro tunc relief on April 22, 2008, at which Kim Lefebvre, Esq., Assistant United States Trustee for Region 2 (the "AUST"), the Trustee, and the Auctioneer appeared. The AUST reported that when the UST's Office had reviewed the Auctioneer's reports it had noticed a buyer's premium indicated on the attachments that had not been disclosed in the Auctioneer's or Trustee's Reports, and that it had brought the matter to the Trustee's attention. The AUST stated that he was convinced there had been no nefarious intent behind the Trustee's failure to disclose, and that it was, in his words, an "honest oops." However, he also emphasized that, as estate property, the buyer's premium absolutely had to be disclosed in the Auctioneer's Report.

In its colloquy with the AUST, the Court expressed concern that the buyer's premium appeared to be simply another name for a higher commission and pointed out that the Local Rules limit an auctioneer's commission to 9% of gross sale proceeds and the instant application sought a 19% commission. The

---

[2] Attached to the January 2008 Reports of Sale were copies of advertising for the two auctions and the auction catalogues, which indicated that a "10% buyer's premium" would be added to all sales. (Exh. to doc. ## 69, 70).

3

Court observed that even if the request had been properly made (in the original application for employment, before the auctions), it was not at all clear that the Court would have approved such a higher commission since the Trustee had not identified any extenuating circumstances surrounding the auctions or other factors warranting a departure from the compensation allowed in the Local Rules. The Court also noted that the buyer's premium appeared to be contrary to the goals of maximizing net proceeds from estate auctions and maximizing the dividend to creditors, as it diverted to the Auctioneer money that would have otherwise been available for distribution to the estate.

The Trustee made a brief statement to the Court and did not offer any explanation for his failure to disclose the buyer's premium. The one circumstance he highlighted was that, based upon his negotiations after the auctions had taken place, the secured creditor voluntarily paid $5,000 of the Auctioneer's expenses from its share of the proceeds, and that amount remained in the estate. The AUST followed up on this point and noted that one of the reasons the UST had decided not to contest the buyer's premium was that the secured creditor had left money on the table (by paying $5,000 of the Auctioneer's expenses) that would not have otherwise been available for the estate.

At the conclusion of the hearing, the Court observed that the Auctioneer had reasonably relied on the agreement he reached with the Trustee as to his compensation, and that the record provided no basis for the Auctioneer to be penalized for the Trustee's failure to disclose. The Court took the matter under advisement, giving the Trustee and UST an opportunity to file additional pleadings to support their positions with respect to payment of the buyer's premium. Neither did, but the Trustee filed a supplemental affidavit on behalf of the Auctioneer, in which the Auctioneer further described the work he performed as services that "exceeded the normal scope of the Auctioneer's duties," and asked that he be allowed to retain the buyer's premiums that he had retained after the two auctions (doc. # 97).

## DISCUSSION

**I.    Statutes and Rules Pertaining to the Employment of Professionals in Bankruptcy Cases**

The Code, Federal Rules of Bankruptcy Procedure, and Local Rules all provide some direction concerning the employment of professionals, including auctioneers, in bankruptcy cases. Section 327[3] provides that "the trustee, with the court's approval, may employ one or more . . . auctioneers . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." § 327(a). Section 330 of the Code governs the fees that may be awarded to professionals employed under § 327:

> After notice to the parties in interest and the United States Trustee and a hearing. . . the court may award to . . . a professional person. . .
>
> (A)    reasonable compensation for actual, necessary services rendered by

---

[3] All statutory citations herein refer to Title 11, United States Code (the "Bankruptcy Code") unless otherwise indicated.

4

the . . . professional . . . ; and

    (B)    reimbursement for actual, necessary expenses.

§ 330(a)(1). Section 330(a)(3) also provides a number of "relevant factors" to assist courts in determining what constitutes "reasonable" fees. Fed. R. Bankr. P. 2014 sets out the procedure by which applications for employment of professionals are to be made. It provides that an order approving such employment shall be made only upon application of the trustee; a copy of the application shall be transmitted to the UST; the application shall state facts showing the necessity for the employment, including "the professional services to be rendered [and] any proposed arrangement for compensation." Rule 2014(a). Finally, Local Rule 6005 (the version in effect on the date of all pertinent filings herein) limits compensation of auctioneers as follows:

> (a) Compensation. Unless otherwise ordered by the Court <u>for good cause</u>, compensation and reimbursement of expenses shall be allowed to an auctioneer for sale of property as set forth in this Rule. The <u>maximum allowable commissions</u> on the gross proceeds of each sale are as follows:
>
> (1) 10% of any gross proceeds of sale on the first $100,000 or less;
>
> (2) 5% of any amount in excess of $100,000, but not in excess of $200,000; and
>
> (3) 2.5% of any amount in excess of $200,000.

Vt. LBR 6005-1(a) (emphasis added). The Local Rule also provides that the auctioneer shall be reimbursed for "reasonable and necessary expenses directly related to the sale," Vt. LBR 6005-1(a)(4), and that the report of sale filed by the auctioneer should contain, <u>inter alia</u>, "an itemized statement of commissions sought under this Rule and disbursements made." Vt. LBR 6005-1(d)(3). Most pertinent to the issue at hand is the following provision: "No compensation or commission may be paid to the auctioneer until approved by the Court. . ." Vt. LBR 6005-1(e).

## II. The Standard for Assessing <u>Nunc Pro Tunc</u> Motions

Before addressing the merits of the Trustee's Motion, it is important to point out what relief he is <u>not</u> seeking. The Trustee is not asking the Court to grant a <u>nunc pro tunc</u> application to employ an auctioneer after services had already been rendered; the Court has already granted the motion to employ this Auctioneer. Instead, the Trustee is asking the Court to modify the fee structure contained in that order to add the buyer's premium.

In <u>Cushman & Wakefield of Connecticut, Inc. v. Keren Ltd. P'ship (In re Keren Ltd. P'ship)</u>, 189 F.3d 86 (2d Cir. 1999) (per curiam), the Second Circuit held that <u>nunc pro tunc</u> approval to employ a professional (there, a real estate brokerage firm) "should only be granted in narrow situations and requires that (i) if the application had been timely, the court would have authorized the appointment, and (ii) the delay in seeking court approval resulted from extraordinary circumstances." <u>Id.</u> at 87. The Circuit Court reviewed the bankruptcy court's decision refusing to grant such refusal for an abuse of discretion. <u>Id.</u> at 88. In <u>Schwartz v. Aquatic Dev. Group, Inc. (In re: Aquatic Dev. Group, Inc.)</u>, 352 F.3d 671 (2d Cir.

5

2003), the Second Circuit clarified that the Keren test did not apply solely to motions seeking nunc pro tunc orders to employ professionals, but to any motion seeking nunc pro tunc relief in bankruptcy court. The Court stated, "[O]ur decision in In re Keren provides a yardstick against which we may measure whether a bankruptcy court should have granted nunc pro tunc relief." Id. at 677. Accordingly, this Court must apply the Keren test to determine whether to grant the Trustee's Motion.

## III.     Application of the Nunc Pro Tunc Standard

As a preliminary matter, all funds collected at a bankruptcy auction, including a buyer's premium, are property of the bankruptcy estate. Section 541 broadly defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of this case," § 541(a)(1), and § 546(a)(6) defines estate property to include all "[p]roceeds. . . or profits of or from property of the estate." The Debtor owned office equipment and inventory on the date of filing, and these items were listed in his schedules. The sale of those items can only be viewed as sale of estate property. See Priddy v. Eley (In re Rossmiller), 82 F.3d 426, 1996 WL 175369 at *2 (10th Cir. 1996) (unpublished decision) (stating that the gross proceeds from an estate auction constituted property of the estate, and noting that "several bankruptcy courts have determined that a fee paid by a purchaser of estate assets to a broker or auctioneer is a commission paid from the estate's proceeds") (listing cases). As a policy matter, this Court would be loathe to endorse a procedure where money earned from estate proceeds could bypass the estate and go directly into an auctioneer's pocket without being accounted for. Such a practice could easily be abused. It is essential that the case trustee, as a fiduciary of the estate, collect and account for all monies that result from the liquidation of estate property and then disburse those proceeds according to the distribution rules set forth in the Bankruptcy Code and Rules.

### A.     The First Keren Prong

The first prong of the Keren test asks Court to determine whether it would have granted the relief requested if the application had been timely made. The answer here is an unequivocal no. First, the Local Rules provide a "maximum allowable commission" of 10% of gross proceeds on the first $100,000 and 5% of any amount between $100,000 and $200,000. Adding the 10% buyer's premium to the commission collected by the Auctioneer would result in a total commission of 19% on the first $100,000 and 18% of the proceeds in excess of $100,000 which far exceeds what the rules permit. Second, the Court has grave concerns that a buyer's premium could have a chilling effect on a bankruptcy auction and could diminish the amount of proceeds available to the estate. Other courts have voiced similar concerns. In In re Driller, 2004 WL 1661981 (Bankr. D.Idaho, July 7, 2004), the bankruptcy court held a hearing on buyer's premiums and learned that while the National Auctioneer's Association stated that such premiums are accepted in many areas, some participants perceived them as an annoying "gimmick" or "buyer's surcharge" that caused purchasers to pay more than they otherwise would. Id. at *4 & nn.5, 6. The court noted that some sellers did not like the buyer's premiums either. "They feel, and accurately so, that the buyer's premium is

6

primarily coming out of their own pocket. . . .The more experienced the auction seller, the more negative their opinion of buyer's premiums. The only sellers that seem to like the buyer's premiums are those that have been erroneously convinced that the premium is not costing them anything." Id. (quotation omitted). The court concluded that, in essence, "the idea is that when buyers reduce their bid prices to compensate for buyer's premiums, the seller's revenue is negatively impacted." Id. (quotation and citation omitted). As a result, the estate (as seller) receives less money from the auction. Because buyers' premiums have never been sought in bankruptcy auctions in Vermont, a hearing to explore the pros and cons would have been critical to the Court's determination of whether a buyer's premium could ever be justified and whether it was appropriate in this case.

Moreover, nothing in the Trustee's original application indicated that the Auctioneer would be making an effort above and beyond the call of duty that might have prompted the Court to find "good cause," as required by the Local Rules, see Vt. LBR 6005-1(a), for determining that a fee in excess of the rule was reasonable and warranted. As a consequence, the Trustee's Motion fails the first prong of the Keren test.

### B. The Second Keren Prong

The next question the Court must address is whether the eight-month delay in the Trustee's seeking court approval of the buyer's premium resulted from extraordinary circumstances. Here, too, the answer is an unequivocal no. To justify nunc pro tunc relief, the Trustee stated that he "neglected, through inadvertence" to mention the buyer's premium in the original application, and that failure to mention it was an "oversight" (doc. # 78). Courts considering the second Keren factor have held that dilatory and neglectful conduct in making a nunc pro tunc application does not constitute extraordinary circumstances. See Aquatic Dev., 352 F.3d at 679 (observing that "simple neglect" in failing to take timely action, including dilatory conduct on the part of the trustee, does not constitute the "extraordinary circumstances" necessary to justify nunc pro tunc relief). Accord Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence"); In re Jarvis, 53 F.3d 416, 421 (1st Cir. 1995) ("if the category of extraordinary circumstances were expended to include mere oversight, the modifying adjective 'extraordinary' would be completely emptied of its meaning").

Based on the two Keren factors, the Court must deny the Trustee's Motion to modify the employment application nunc pro tunc.

### IV. Equitable Grounds May Authorize Payment of the Buyer's Premium

Based upon these findings and conclusions, the Auctioneer is in an unenviable position: He detrimentally relied on the Trustee's agreement with him regarding his compensation, including the assurance that he would receive a buyer's premium; he performed his duties faithfully and well in accordance with that agreement; and now, with the denial of the Trustee's Motion, the Auctioneer cannot realize the full

7

benefit of that agreement, through no fault of his own. Compounding this unfortunate situation is the fact that both the Trustee and the UST have stated that the Auctioneer performed exceptionally well and, as a result of his skill and time-intensive efforts, the auctions were "resounding success[es]" (doc. # 78).

The Court interprets the arguments of the Trustee and UST to support a finding that the Auctioneer deserves a bonus (in the form of a buyer's premium) for his high quality and labor-intensive work that yielded impressive results. "In evaluating requests for a fee enhancement, bankruptcy courts have core jurisdiction under 11 USC § 330 to determine the allowance of all fees" for attorneys or other professionals, In re Gencor Indus., Inc., 286 B.R. 170, 176 (Bankr. M.D. Fla. 2002), and "enjoy wide discretion in determining reasonable fee awards," In re Raytech Corp., 241 B.R. 785, 788 (D. Conn. 1999). Most cases involving fee enhancements concern attorneys, but the same principles should apply to all professionals whose fees are guided by §§ 327 and 330. Bankruptcy courts have long provided bonus compensation for "exemplary efforts" by counsel, "warranted if the attorney's skill, diligence and experience so merit, or if the results obtained were particularly favorable in view of the obstacles presented." In re Bible Deliverance Evangelistic Church, 39 B.R. 768, 775 (Bankr. E.D. Pa. 1984). As one court held,

> fee enhancements are allowed and should be encouraged where the attorney's initiative, perseverance, and skill lead to an extraordinary success quickly, efficiently, and effectively. In considering fee enhancements in a bankruptcy case, courts should examine the way the attorney worked to maximize the value of assets in the case and to increase distributions to all classes of creditors.

Gencor, 286 B.R. at 179. Although the Second Circuit has not addressed the issue, the Third Circuit has held that bankruptcy courts have both the power to increase or reduce professional fees sua sponte, which follows from the wording of § 330(a) and § 105(a),[4] and the duty to do so, based on the "court's inherent obligation to monitor the debtor's estate and to serve the public interest." In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 841(3d Cir. 1993).

Given the discretion accorded the Court to determine professionals' fees, and the power and duty it has to independently review whether the fees paid to professionals are reasonable under the circumstances, this Court holds that, despite denying the Trustee's nunc pro tunc motion, it may still, sua sponte, grant the Auctioneer a fee adjustment, if it is warranted, based on §§ 105 and 330. The unequivocal statements of the Trustee and AUST that the Auctioneer performed his duties exceptionally well provides the necessary basis for the Court to consider taking this unusual step to award the Auctioneer a commission in excess of the maximum commission authorized by the Local Rules (in the form of a buyer's premium) to properly compensate him for his services. In addition, in the Court's estimation, providing

---

[4] Section 105 provides:
> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

the Auctioneer with the benefit of the bargain the Trustee struck with him, and upon which he relied in good faith, is mandated by principles of equity. It is also essential to the integrity of the bankruptcy system that professionals asked to perform services for bankruptcy estates in this District know that they will be treated fairly.

The Auctioneer involved in this case had never conducted a bankruptcy auction and was not acting unreasonably when he relied upon the Trustee to guide him through the appointment and compensation processes set forth in the Bankruptcy Code, Federal Rules, and Local Rules that govern auctions of bankruptcy estates. Moreover, the Local Rules of this Court squarely place responsibility for employing estate professionals on the retaining party.

> Retention Procedure. Whenever a party employs a professional whose employment requires court approval under the Bankruptcy Code or Bankruptcy Rules, it is the duty of primary counsel for the employing party to ensure that such approval is properly sought and to advise the professional of the requirements and risks, if any, pertaining to the professional's ability to subsequently obtain compensation and reimbursement of expenses from the estate.

Vt. LBR 2014-1(a). Here, it was the Trustee who retained the Auctioneer. Hence, the Trustee was responsible for ensuring that all requirements related to the Auctioneer's retention and compensation were satisfied.

It cannot be gainsaid that the Code and the Federal and Local Rules require that an auctioneer's entire commission be disclosed in the application for employment to allow the Court to determine the reasonableness of the fees sought. If extraordinary circumstances exist that indicate that the work to be performed by the auctioneer in connection with a particular auction will be more time consuming or requires greater skill, or would otherwise remove the auction from the garden-variety auctions usually conducted in bankruptcy proceedings, the Court may approve additional compensation for good cause shown. See Vt. LBR 6005-1(a). The burden is on the case trustee to bring these factors to the court's attention, and the time to do so is before the auction takes place. The mechanism the case trustee must use is a motion, on notice to all interested parties, that discloses the extraordinary circumstances warranting additional compensation, the nature and amount of the additional compensation sought, and the revised terms of compensation being proposed. Full disclosure is an essential prerequisite to the Court awarding compensation from the estate in excess of the cap set forth in the Local Rule. If a buyer's premium is to be requested as part of an auctioneer's commission, it is "undeniably relevant information," and the "anticipated use of a buyer's premium, and the details regarding that premium, must therefore be disclosed." Driller, 2004 WL 1661981 at * 2. The fact that the Federal Rules of Bankruptcy Procedure include a special provision, applicable specifically to auctioneers and appraisers, "obviously makes the disclosure requirements of Rule 2014(a) critically important, including, as noted, disclosure of the use of a buyer's premium." Id. at * 3 (citing cases and 9 Collier on Bankruptcy § 2014.02 at 2014-4).

9

After denying the Trustee's motion for <u>nunc pro tunc</u> relief, and considering the disclosure defects and equities involved in this case, the Court confronts this question: if the Auctioneer deserves to be paid according to the agreement the Trustee made with him, and it was the responsibility of the Trustee to ensure that the Auctioneer's entire compensation was approved in advance of the auction, and the Trustee failed to do this, why should it not be the Trustee, rather than the estate, that pays the extra compensation to the Auctioneer?

Pursuant to § 326 of the Bankruptcy Code,[5] the Court has discretion over the compensation awarded to case trustees. See <u>In re Testaverde,</u> 317 B.R. 51, 53-54 (E.D.N.Y. 2004) (noting that bankruptcy courts have broad discretion in issues of compensation because they have "a far better means of knowing what is just and reasonable" than an appellate court (quoting <u>Matter of Shades of Beauty, Inc.</u>, 95 B.R. 17, 18 (E.D.N.Y. 1988)), and upholding bankruptcy court's reduction of trustee's commission). Here, a reduction seems warranted.

The disclosure requirements under Rule 2014 are strict and courts have sanctioned offenders, even innocent or negligent offenders, in various ways. See <u>In re Jackson</u>, 2008 WL 2074156 at *3-4 (discussing attorney compensation and citing cases holding that failure to comply with disclosure rules is a sanctionable offense); <u>In re Plaza Hotel Corp.</u>, 111 B.R. 882, 883 (Bankr. E.D.Cal. 1990) (noting that return of an attorney's retainer can be an appropriate sanction for defective disclosure under Rule 2014, even if the duty was neglected, even innocently, and citing <u>In re Rogers-Pyatt Shellac Co</u>., 51 F.2d 988 (2d Cir. 1931)). In such circumstances, "The Court is given the inherent authority over [the professional's] compensation to approve or deny fees and costs, in whole or in part, if a violation of disclosure occurs." <u>Jackson</u>, 2008 WL 2074156 at * 4. A case trustee may also be sanctioned. See <u>In re Granite Partners, L.P.</u>, 219 B.R. 22, 40-46 (Bankr. S.D.N.Y. 1998) (imposing sanction by way of fee reduction on chapter 11 trustee for failure to disclosure trustee's counsel's conflict of interest).

Whether viewed as a sanction based upon a failure to comply with the rules governing bankruptcy fiduciaries' employment of professionals or as a reduction of commission imposed to balance the equities, this Court must consider whether the most reasonable and fair resolution of this matter may be to reduce the Trustee's commission by the amount of the buyer's premium and to redirect this amount to the Auctioneer to fund the buyer's premium portion of his compensation.[6] Several factors would appear to

---

[5] Section 326 of the Bankruptcy code governs the compensation that a trustee may receive. It provides, in relevant part:

> In a case under chapter 7 or 11, the court may allow reasonable compensation ... of the trustee for the trustee's services, payable after the trustee renders such services, <u>not to exceed</u> 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000 ... upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326 (emphasis added).

[6] Should the Court direct payment of the buyer's premium from the Trustee's commission, the Court notes that the Auctioneer would be paid the lesser of $10,831.05 (the buyer's premium identified in the Reports) or the amount of the Trustee's § 326

support this resolution. First, as indicated above, the Trustee failed to timely disclose the terms of his agreement with the Auctioneer; this situation went uncorrected for eight months; and it was only after the UST brought the matter to the attention of the Trustee that he made full disclosure (in the nunc pro tunc motion) of his agreement to pay a buyer's premium to the Auctioneer.[7] Second, the Court considers this disclosure defect extremely serious, and finds that it undermines the essential requirement for disclosure – and creditor review – of all contracts relating to the retention of professionals by bankruptcy estates. Further, the Court does not consider "oversight" to be an adequate explanation by a fiduciary charged with maximizing the distribution to the estate, particularly when the buyer's premiums were substantial, resulted in compensation much higher than allowed by the Local Rules, and significantly reduced the distribution to unsecured creditors beyond what they would otherwise have reasonably expected from these auctions. Lastly, the record is devoid of any explanation as to why the Trustee failed to recognize the importance of disclosing all terms of his unique agreement with the Auctioneer in the original application, or failed to detect its omission in the original reports of sale and notice of intent to sell property.

In sum, the Court finds the record supports the conclusions that: (i) the Auctioneer is entitled to the buyer's premium both for the excellent services he performed in this case and in recognition of his reasonable reliance upon the agreement the Trustee made with him; (ii) since there is no basis in law to grant that relief through nunc pro tunc modification of the order employing him, it is appropriate to rely upon principles of equity to find a source of funds from which to compensate the Auctioneer; and (iii) there is good cause, under the circumstances presented, to hold the Trustee liable for the buyer's premium, and to shift liability for the Auctioneer's "extra" compensation from the unsecured creditors to the Trustee, who contracted to pay the buyer's premium without notice to creditors of the additional administrative expense and without Court approval.

There is precedent for this approach in this District. In In re Applied Biometrics Prods., Inc., No. 02-10787 (Bankr. D.Vt. Mar. 6, 2003), the chapter 7 case trustee had failed to obtain an order appointing special counsel. The Court invoked principles of equity to compensate the professional – from the trustee's commission – for services that, like here, were of significant value to the estate. The Order on Allowance of Fees for Post-Petition Legal Fees provided:

> THE COURT FURTHER FINDS that in order to both comply with the principles enunciated in In re Keren Ltd. P'ship, and compensate the Movant for the valuable services it provided to the estate, the payment of Movant's fee for post-petition legal services must be paid in a way that does not diminish the distribution to creditors in this case.

---

commission.

[7] This is especially troubling since the auction advertising, and catalogue attached as addenda to the January 2008 Reports of Sale indicated that the buyer's premium would be assessed; and it would certainly seem that the Trustee would have reviewed these documents.

11

Therefore, IT IS HEREBY ORDERED that

> 1. the Movant's Motion for Allowance and Payment of Administrative Expenses is GRANTED; and the trustee is directed to pay Movant's fees for services rendered post-petition to the case trustee as an administrative expense; and
>
> 2. the amount of compensation that the case trustee would otherwise be eligible to apply for under 11 U.S.C. § 326 shall be reduced by an amount equal to the Movant's administrative expense and the trustee is hereby ordered to reduce his application for §326 compensation accordingly.

Applied Biometrics (doc. # 50, Mar. 6, 2003).

Notwithstanding that the record in this case and the case law in this District appear to support a determination that the buyer's premium should be paid to the Auctioneer out of the Trustee's commission, principles of equity and fairness mandate that the Trustee, the UST, and any other interested parties be given an opportunity to present arguments on the issue before a determination is made. Accordingly, the Order entered with this Memorandum of Decision directs the Trustee to appear and show cause why the buyer's premium should not be paid from estate funds that would otherwise be paid to him as a § 326 commission in this case, and sets forth a briefing schedule on that issue.

## **CONCLUSION**

For the reasons set forth above, the Court denies the Trustee's motion to amend the Application to Employ Auctioneer nunc pro tunc. Given the equitable considerations in this case, however, it appears to the Court, based upon the record, the cases cited above, and §§ 105 and 330, that the Auctioneer is entitled to be paid a buyer's premium as provided in the Trustee's agreement with him and that this sum should be funded from the estate monies that would otherwise comprise the Trustee's commission. The Court will make a determination whether to direct payment of the Auctioneer's buyer's premium from the Trustee's commission after consideration of arguments that the Trustee and UST interpose in response to the Order to Show Cause that accompanies this Memorandum of Decision.

This constitutes the Court's findings of fact and conclusions of law.

June 26, 2008  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge